Herriman *v.* Skillman.

---

[KINGS GENERAL TERM, February 11, 1861. *Lott, Emott* and *Brown,* Justices.]

W. S. HERRIMAN, president of the Long Island Bank, *vs.* JOHN SKILLMAN, president of the City Bank of Brooklyn, and others.

The general principle is that when a creditor has a lien upon two funds for the same debt, and another creditor has a subsequent lien upon one of the funds only, equity will require the former to resort, in the first instance, to the fund upon which the subsequent creditor has no lien, for the satisfaction of his debt.

The rule, however, is subject to some qualifications. Such a course must appear to be necessary for the payment and satisfaction of both debts. And it must not operate to prejudice the rights of the first creditor to the double fund.

Neither must there be any reasonable doubt of the sufficiency of the one fund to satisfy the debt of the first creditor.

Where, in a foreclosure suit brought by the holder of the first lien, there is reason to think that both the real estate mortgaged and certain personal securities which are subject to the plaintiff's lien, would, if brought to a sale, be insufficient to pay the debt and interest due from the mortgagor, the equitable rule does not apply, in favor of subsequent mortgagees or judgment creditors.

Under such circumstances, all that the subsequent incumbrancers have a right to claim is, a judgment awarding to them, after the payment of the plaintiff's debt, the right in the order of the priority of their respective liens, to be subrogated to the plaintiff in respect to the securities then held by him.

THIS action was brought to foreclose a mortgage made by the defendant Bannon. The defendants, other than Bannon, were made parties as subsequent incumbrancers. On the 18th September, 1855, the plaintiffs held certain promissory

notes made or indorsed by the defendant Bannon, which they had discounted for him, amounting to $24,260.74. To secure payment of these notes, and of the renewals thereof, Bannon executed a mortgage (to foreclose which this suit was brought) on the 18th September, 1855. The plaintiffs, at the time, held as collateral security for payment of these notes, certain "street securities," (i. e. official certificates for work done by Bannon on the public streets,) the amounts named in which certificates would be payable in certain contingencies, at subsequent periods, &c. When the mortgage was taken it was, by agreement between the plaintiff and Bannon, made the primary security, and the "street securities" were retained by the plaintiffs to secure new loans to be made to Bannon, after the payment of which, they were to be applied to secure the mortgage debt, which new loans were so made. When the suit was brought by the plaintiffs (to foreclose the mortgage to the Long Island Bank,) in December, 1858, the mortgage debt had been reduced from $24,260.74 to $16,805 and *interest.* All moneys received by the respondents from any securities held by them, were applied to payment of the debts of Bannon, for which they were specially pledged, and toward the reduction of the mortgaged debt. The amount due on the mortgage debt was, as per judgment,_____$17,786 15

Value of the land (without deducting

taxes, assessments and interest, which

would largely reduce this item,) _____ 9,656 83

Outside value of the street securities, if

sold, _____ 7,552 82

These street securities, "if held until

their maturity, and properly nursed

and held until the money could be col-

lected, might be worth $3000 more," ———— 17,209 65

Deficiency in value of mortgaged property and

securities for payment of the mortgaged debt,

(to say nothing of the assessments, taxes, and ————

interest, also due on the land and debt,)_____ $576 50

Some time after Bannon's mortgage to the plaintiff, the appellant, the City Bank of Brooklyn, took a mortgage from him on the same premises, and had no other security for its debt. The defendants, Beers and Mackay, respectively obtained judgments against Bannon, (subsequent to the plaintiff's mortgage,) and were also made defendants in this action. Before bringing this suit, the plaintiffs offered to substitute the appellants in their place, and to deliver to them all securities held by the plaintiffs, on payment of the amount due to the plaintiffs, less five per cent. The like offer was made to Beers and Mackay respectively. Such offers were not accepted. The value of the mortgaged premises, and of the "street securities," at the time of the foreclosure, was less than the amount due on the mortgage. Under these circumstances, the learned judge before whom the cause was tried, decided that the plaintiff was entitled to the usual judgment of foreclosure and sale, for the payment of $17,786, that being the amount claimed to be due, with interest and cost ; but that the defendants in the order of the priority of their respective liens might be subrogated to the securities then held by the plaintiff, upon payment of the amount so found to be due to him. From this judgment the defendant, the City Bank of Brooklyn, appealed.

*John N. Taylor,* for the appellant.

*B. D. Silliman,* for the respondent.

*By the Court,* BROWN, J. It is material to a right understanding of the questions involved in this action to notice the dates of the liens of the two banks upon the mortgaged premises, and the time of the agreement made by Timothy Bannon, the mortgagor, with the Long Island Bank, in regard to the drafts or orders designated in the pleadings and proofs as the street securities. The mortgage to the latter bears date, and was made, on the 18th of September, 1855,

and its purpose was to secure to the bank the payment of certain promissory notes which it had discounted for the use and benefit of Timothy Bannon, and such other notes or written obligations as should be given to renew such notes, or any of them. At this time the Long Island Bank held certain securities for the payment of these notes, being the orders of Bannon, the mortgagor, who was a contractor, upon the comptroller of the city of Brooklyn for work done or to be done upon certain streets of the city, and payable not by the city out of its treasury, but out of the assessments to be imposed upon the property benefited, for the improvements whenever the work was done and the assessments collected ; which orders were nominally for the agregate sum of $19,272.54, but which the proof showed were not presently by any means of that value. The bank did not accept and receive the mortgage upon the real estate in Brooklyn as a security subsequent in point of time and in addition to the street securities. But to afford Bannon an additional means of credit the mortgage was substituted in the place of these orders or drafts, to be held as the primary security. It being expressly agreed between Bannon and the bank that the orders and drafts should be held by it to secure in the first place new loans and advances which might be made to him, and after they were paid and satisfied then to secure the notes and liabilities of Bannon held by the bank when the mortgage was given, and the renewals thereof. This agreement is abundantly proved by the testimony, and is one of the facts found by the judge who tried the action at the special term. This arrangement was made some seventeen months before the City Bank of Brooklyn obtained their lien upon the mortgaged premises. It was an arrangement entirely legal and proper in its object and purpose, and one which the parties to it had a perfect right to make, and of which no other creditor of Bannon could have any legal ground to complain. The bank had the right to substitute the real property as the primary security for the debt already

created, and. to hold the orders and drafts in addition and secondarily thereto, and for such future advances as Bannon might require; and he also had a right to make the pledge, and thus secure to himself new advances for the prosecution of his business. No person could possibly be prejudiced by the agreement. On the 23d day of February, 1857, the City Bank of Brooklyn had discounted Bannon's notes to the extent of $11,000. Desiring to obtain some security therefor, its president applied to the Long Island Bank for information, when the cashier thereof communicated to such president the amount of Bannon's indebtedness to the latter bank, and the nature and particulars of the securities held by it to secure the payment thereof. The City Bank of Brooklyn thereupon received from-Bannon the mortgage set up in the answer, as security for the payment of its debt. It therefore accepted and now holds this mortgage, subject to the prior rights acquired by the Long Island Bank at the time it was given.

The proofs furnish no evidence to show that the plaintiff has done any act to impair the rights or prejudice the claim of the City Bank to the mortgaged premises. No part of the securities held by the former has been relinquished, given up, or appropriated to any purpose foreign to the agreement, without at the same time liquidating an equivalent portion of the debt which the mortgage and the orders were designed to secure. It appeared by the testimony of George L. Sampson, the cashier of the Long Island Bank, that some of the original notes discounted for Bannon were made by other persons and indorsed by him. These amounted to the sum of $2937, and were not paid by the makers. To enable Bannon to pay them, the bank discounted for him one of the street securities held by the bank, to the extent of $2800, which sum, with other funds to his credit in the bank, he paid, and took up the notes referred to, amounting to $2937. This occurred in August or September, 1856. The notes thus paid and given up to Bannon were indeed the notes of

other persons. They were however indorsed by Bannon and discounted for him, and not for the makers. They therefore constituted a part of his debt to the bank which the street securities were intended to secure. And when one of them was discounted and the proceeds applied to the payment of Bannon's debt due to the bank, it was in strict fulfillment and execution of the contract, and the City Bank cannot complain. The witness George L. Sampson also testified that all the notes made by others than Bannon, and discounted for him, were paid by the makers, except the notes for $2937. There is nothing to show who the makers of these notes were, nor by what means Bannon became possessed of them. But as he brought them to the bank and they were discounted for him and afterwards paid by him, in the absence of all proof to the contrary I regard them as notes made to be discounted for his accommodation, and which it was his duty and obligation to pay. Besides, the draft was discounted and the notes given up to Bannon in August or September, 1856, six months before the City Bank acquired its lien. It was not in a situation to be prejudiced. And the character of the notes is of no moment whatever.

By force of the agreement between the plaintiff and Timothy Bannon, the former has a lien upon the real estate described in the mortgage, prior to the lien of the defendant, the City Bank of Brooklyn, and the plaintiff has also a lien as security for the payment of the same debt from the drafts and orders referred to in the proofs, and upon which the City Bank has no lien. The latter insisted, upon the trial, and now claims, that before any sale of the real estate mortgaged be effected, the plaintiff should be required to apply the balance of the orders or drafts to the liquidation of its debt. The general principle doubtless is in favor of this claim. That when a creditor has a lien upon two funds for the same debt, and another creditor has a subsequent lien upon one of the funds only, equity will require the former to resort in the first instance to the fund upon which the subsequent creditor

has no lien for the satisfaction of his debt. (1 *Story's Eq. Jur.* 633, *and the cases referred to in note* 2.) The rule, however, is subject to some qualification. Such a course must appear to be necessary for the payment and satisfaction of both the debts. And it must not operate to prejudice the rights of the first creditor to the double fund. Neither must there be any reasonable doubt of the sufficiency of the one fund to satisfy his debt. Speaking of the relief to which a junior creditor will be entitled, under such circumstances, Chief Justice Spencer, in *Evertson* v. *Booth,* (19 *John.* 486,) says: " But a court of equity will take care not to give the junior creditor this relief if it will endanger thereby the prior creditor, or in the least impair his prior right to raise his debt out of both funds. The utmost that equity enjoins in such a case is that the creditor who has a prior right to the two funds shall first exhaust that to which the junior creditor cannot resort; but when there exists any doubt of the sufficiency of that fund, or even where the prior creditor is not willing to run the hazard of getting payment out of that fund, I know of no principle which can take from him any part of his security until he is completely satisfied." The witness George L. Sampson describes the street securities held by the plaintiff under the agreement, and their probable present and future value, in these words: " We have now on hand $10,074.45 of the original street securities of those held prior to and at the time of the mortgage; and other street securities have from time to time been received to about $18,000. The whole amount of the street securities now held is about $20,000. They are payable at future indefinite periods. Some of them are tax titles, leases and certificates, which are payable when the works are completed and the assessments are paid. I do not know their value. I would not give $4000 for them, but with careful nursing they will produce more. The interest due to this day is $816.82. Yesterday I paid $9 to redeem some of the mortgaged property covered by the leases." This testimony was corroborated by that of

Herriman *v.* Skillman.

John D. Lawrence, who also said that " he made the list of the securities now handed me. $7552.82 is the utmost that could, in my judgment, be made out of them at the most fa-vorable sale. If they are retained, however, until their maturity, and properly nursed and held until the money is collected, I think they might be worth $3000 more." Assuming this estimate to be true, (and it was not invalidated,) and adopting the valuation put by the witness John D. Lawrence upon the real estate covered by the mortgage, there is reason to think that both the real and personal property subject to the plaintiff's lien would, if brought to a sale, be insufficient to pay the debt and the interest thereon due to it from the defendant Timothy Bannon. The equitable rule upon which the counsel of the City Bank of Brooklyn relies does not apply to such a case; and so the judge determined who tried the action at the special term.

It also appeared from the evidence, that on the 18th day of September, 1855, the defendant Timothy Bannon executed and delivered to the plaintiff, as further security for the payment of his notes and liabilities, a chattel mortgage upon certain horses, carts, and double and single wagons, which was duly filed in the proper office and was not renewed at the end of the year. It also appeared that on the 12th July, 1858, the defendant Bannon also made an assignment to the plaintiff of the rents of his real estate, for the purpose of securing the payment of the same debts and liabilities, which was afterwards surrendered to Bannon by the plaintiff after it had received notice, on the 19th January, 1859, of a motion by the City Bank of Brooklyn, to appoint a receiver of the mortgaged premises, and to enable Bannon to assign to such receiver. Nothing however was ever received or realized by the plaintiff from the chattel mortgage or from the rents of the real estate. I am not able to see how the plaintiffs' right to collect its debt from a foreclosure and sale of the mortgaged premises is in any way affected by these transactions.

Concurring as I do with the judge at the special term in the

results at which he arrives upon the principal questions involved in the controversy, his calculation and estimates of the sum due to the plaintiff and for which the judgment of foreclosure was entered is entirely correct. In awarding to the judgment creditors having liens, Edwin Beers and John S. Mackay, and the City Bank of Brooklyn, the right to be subrogated to the plaintiff, in the order of the priorities of their respective liens, the court at special term did all that the defendants had a right to claim.

The judgment should be affirmed, with costs to be paid by the appellant.

[KINGS GENERAL TERM, February 11, 1861. *Lott, Emott* and *Brown,* Justices.]